THE PEOPLE *ex rel.* Francis B. Peabody,

*v.*

THE CHICAGO GAS TRUST COMPANY.

*Filed at Ottawa November 26, 1889.*

1. CORPORATIONS—*powers of corporations—expressed and incidental.* Corporations can only exercise such powers as may be conferred by the legislative body creating them, either in express terms or by necessary implication, and the implied powers are presumed to exist to enable such bodies to carry out the express powers granted and to accomplish the purposes of their creation. An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has merely some slight or remote relation to it.

2. SAME—*"unlawful" purpose and acts of corporation.* The word "unlawful," as applied to the purposes and acts of corporations, is not used exclusively in the sense of *malum in se* or *malum prohibitum.* It is also used to designate powers which corporations are not authorized to exercise, or contracts which they are not authorized to make, or acts which they are not authorized to do,—or, in other words, such acts, powers and contracts as are *ultra vires.*

3. SAME—*charter of corporate powers, under the general law—in what it consists.* The charter of a corporation formed under a general law does not consist of the articles of association alone, but of such articles taken in connection with the law under which the organization takes place. The provisions of the law enter into and form a part of the charter.

4. The action of the Secretary of State in issuing the license and certificate of organization is necessarily, to a large extent, merely ministerial. Whether the articles of association, etc., do or do not confer such rights and powers as are authorized by the law, is a matter for judicial determination. When a corporation is formed under the general act, the law, and not the statement or the license or the certificate, must determine what powers can be exercised.

5. SAME—*acquiring stock in other corporations.* A corporation formed under the general law for a lawful purpose, such as the manufacture and sale of gas, can not clothe itself with power to purchase and hold stock in similar corporations merely by naming this as one of the objects of its incorporation in the articles filed with the Secretary of State.

6. A corporation can not become a stockholder in another corporation unless such power is expressly given or is necessarily implied, and

this more especially when the object is to obtain the control or affect the management of such other corporation.

7. The general Incorporation law of this State does not, in express terms, confer upon corporations formed thereunder the power to purchase and hold shares of stock in other corporations, but is silent on the subject. The only powers granted by it are the ordinary corporate powers, such as the right to be bodies corporate and politic, to sue and be sued, to have a common seal, etc.

8. Section 5 of the general Incorporation law expressly restricts the powers of a corporation formed under such law, to such as are necessary to carry into effect the objects for which it was formed. The purchase of stock in other companies not being necessary to enable a gas company to carry its object of making and selling gas into effect, is impliedly prohibited by the statute.

9. SAME—*monopolies—as the result of a grant of corporate powers.* Whatever tends to prevent competition between those engaged in an employment or business impressed with a public character, is opposed to public policy, and therefore unlawful; and whatever tends to create a monopoly is unlawful, as being contrary to public policy. All grants creating monopolies, and acts tending to prevent proper competition, are, by the common law, illegal and void.

10. If grants and contracts the tendency of which is to create monopolies are void at common law, then, when a corporation is organized under a general statute, a provision in the declaration of its corporate purposes, the necessary effect of which is the creation of a monopoly, will also be void.

11. SAME—*exclusive privileges—public policy of the State, as indicated in the constitution.* The public policy of a State may be indicated by the provisions of its constitution, as related to past and present legislation. Section 22 of article 4 of the constitution of 1870 provides that the General Assembly shall pass no local or special law for "granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever;" and section 1 of article 11 provides that "no corporation shall be created by special law." The constitution has thereby reversed the old policy of granting exclusive privileges to corporations of any kind.

12. SAME—*gas companies—organized for the purposes of a "trust"— as, by acquiring controlling interests in other gas companies.* Where a charter confers upon a corporation the power to maintain and operate works for the manufacture and sale of gas, it is not a necessary implication that the power to purchase stock in other gas companies should also exist. There is no necessary connection between manufacturing gas and buying stocks.

13. The Chicago Gas Trust Company, being a corporation formed under the general Incorporation law for the purpose of erecting and operating gas works and the manufacture and sale of gas, has no power to purchase and hold or sell shares of stock in other gas companies as an incident to such purpose of its formation, even though such power is specified in its articles of incorporation.

14. The gas trust company mentioned was incorporated under the general law for two purposes, as expressed in its articles of association: First, for the purpose of erecting and operating gas works for the manufacture and sale of gas in Chicago and other places in this State; and second, "to purchase and hold or sell the capital stock, or purchase or lease or operate the property, plant, good will, rights and franchises of any gas works or gas company or companies, or any electric company or companies, in Chicago or elsewhere," etc. The company sought to exercise the powers claimed under the second clause, only, and for that purpose bought a majority of the shares of all the stock of all the gas companies in Chicago, being four in number, whereby it might have the control of all the gas companies in the city, and thus destroy competition and monopolize the gas business: *Held*, that the corporation so formed was not for a lawful purpose, and that all acts done by it toward the accomplishment of such object were illegal and void.

APPEAL from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

This is an information in the nature of a *quo warranto* filed by the Attorney General of the State in the Circuit Court of Cook County against The Chicago Gas Trust Company, summoning the latter to answer to the People of the State by what warrant it exercises certain powers, privileges and franchises therein described. The information sets out in full the charter of "The Chicago Gas Light and Coke Company," granted by the Legislature of Illinois in 1849, an Act amendatory of such charter passed in 1855, an Act to enable the Chicago Gas Light and Coke Company to increase its capital stock passed in 1869; also, the charter of the "People's Gas Light and Coke Company" granted in 1855, and an Act to amend the same passed in 1865; also, in substance, an ordinance passed by the common council of the City of Chicago in 1858, authorizing the People's G. L. & C. Co. to lay its mains

and pipes, etc., in the streets, etc., of said city; and the substance of an agreement made between the Chicago G. L. & C. Co. and the People's G. L. & C. Co. in April, 1862.     Said charters and the Acts amendatory thereof, and said ordinance and agreement are more particularly described in *Chicago Gas Light Co.* v. *People's Gas Light Co.* 121 Ill. 530.   The substance of the litigation between the Chicago Co. and the People's Co., and the result thereof, as passed upon and announced by this Court in the last named case, are also stated in the information.

The information further states that the Chicago G. L. & C. Co. received subscriptions to its capital stock to the amount of $4,984,200.00 and issued certificates for 199,368 shares of such stock, each share for $25.00; that the People's G. L. & C. Co. received subscriptions to its capital stock to the amount of $4,000,000.00 and issued certificates for 40,000 shares of $100 each; that the two companies laid their mains and pipes in the streets of Chicago, and operated their works and furnished gas to the city and its inhabitants, the former, after April, 1862, in the North and South Divisions, and the latter in the West Division, of the city.

The information also sets up that, in January, 1882, "The Consumers' Gas, Fuel and Light Company of Chicago, Ill.," was organized under the general Incorporation Act of 1872, and was authorized, by an ordinance of the common council of Chicago passed April 28, 1882, to construct and operate its works in that city and to lay its pipes and mains under the streets, etc., and proceeded to lay its pipes in the North and South Divisions, and to supply the inhabitants with gas; that, by reason of the foreclosure of a trust deed given by the last named company, its property, rights and franchises passed to and became vested in the "Consumers' Gas Company," a corporation organized, in November, 1886, under the general Incorporation Act.

The proceedings for the incorporation of the "Consumers' Gas Company" are set out in full, showing its capital stock to

be $5,000,000.00 divided into 50,000 shares of $100.00 each; and it is averred that it used the works and pipes, etc., so transferred to it, in manufacturing and distributing gas in the city.

The information sets out the proceedings for, and resulting in, the organization of "The Equitable Gas Light and Fuel Company of Chicago," in August, 1885, under the general Incorporation Law, showing its capital stock to be $3,000,000.00 divided into 30,000 shares of $100.00 each, and avers that an ordinance was passed by the common council of Chicago, giving said company the right to lay down gas pipes and mains in the streets, etc., and that said company kept and maintained such gas mains, etc., and sold gas, etc., in the South Division of the city.

The information still further alleges that the four companies above named, towit: The Chicago Gas Light and Coke Company, The People's Gas Light and Coke Company, The Consumers' Gas Company, and The Equitable Gas Light and Fuel Company of Chicago, were on April 29, 1887, and have been, and are the only gas companies engaged in that business and occupying the streets with gas mains in said city; that, in the ordinances, giving to the Consumers' Gas Fuel and Light Company (succeeded by the Consumers' Gas Company) and to the Equitable Gas Light and Fuel Company the right to occupy the streets, it was provided that such ordinances should not take effect until said companies had given bonds binding themselves respectively not to sell, lease or transfer their franchises and privileges to any other gas company and not to enter into any combination with any other company concerning the rate or price to be charged for gas; that each of said corporations was by law designed to be and of right ought to be a separate, distinct, independent and competing corporation for the manufacture, sale and furnishing of illuminating gas to the consumers thereof in said city; that said four companies when combined and operating under one management or power of control, having a common interest to subserve, form a mo-

nopoly of the business of supplying and selling illuminating gas to the said city and its inhabitants, etc.

The information then closes as follows:

"And that heretofore, to-wit, on the 29th day of April, 1887, at the said county of Cook, the Chicago Gas Trust Company was, and from thence hitherto hath been, and still is, a corporation and body politic, organized and existing under the laws of the State of Illinois, to-wit: 'An act entitled an act concerning corporations,' approved April 18, 1872, and the several acts amendatory thereof; and that the said Chicago Gas Trust Company, for and during the period of twelve months or more last past, at the county of Cook aforesaid, has usurped and unlawfully exercised, and now usurps and unlawfully exercises, powers, liberties, privileges and franchises not conferred by law, to-wit, the power, liberty, privilege and franchise of obtaining, by purchase, or in exchange for its own stock, and holding and owning, and then and there did purchase and receive in exchange for its own stock, and now holds, a majority and controlling interest of and in the shares of capital stock of the said Chicago Gas Light and Coke Company, the said People's Gas Light and Coke Company, the said Equitable Gas Light and Fuel Company of Chicago, and the Consumers' Gas Company, respectively, (as amended May 27, 1889,) and hath thereby, in manner and at the place aforesaid, unlawfully acquired and holds the power to manage and control the said four corporations, to-wit, the said Chicago Gas Light and Coke Company, the said People's Gas Light and Coke Company, the said Equitable Gas Light and Fuel Company of Chicago, and the said Consumers' Gas Company, and hath thereby, and in the manner and at the place aforesaid, destroyed the diversity of interest and motive for competition between them, which would otherwise exist, in the manufacture, distribution and sale of illuminating gas to the city of Chicago and its inhabitants, in said county, and hath thereby usurped and unlawfully secured to itself, in manner aforesaid, and, by means of holding

18—130 ILL.

such majority and controlling interest in the shares of stock of said four last mentioned gas companies, now usurps and unlawfully holds, the power, liberty and franchise of maintaining, through said four several gas companies last mentioned, a virtual monopoly in the business of furnishing illuminating gas to said city of Chicago and the inhabitants thereof, and to the consumers of such gas in said city, to-wit, at the place aforesaid, to the great detriment and injury of the People of the State of Illinois,—all of which said powers, privileges and franchises so exercised by it as aforesaid, though not conferred by law, the said Chicago Gas Trust Company, at and within said county, upon the People of the State of Illinois, hath so usurped and unlawfully exercised, and now doth so usurp and unlawfully exercise, contrary to law and the form of statute in such case made and provided, and against the peace and dignity of the People of the State of Illinois."

Originally the information contained two counts, but the Attorney General entered a *nolle prosequi* as to the second count. Eleven pleas were filed to the first count as finally amended, by the Chicago Gas Trust Company, the defendant below. The first, third and seventh pleas allege, that the Chicago Gas Trust Company is a corporation, formed on the 28th day of April, A. D. 1887, under the general Incorporation Act of this State approved April 18, 1872, and in force July 1, 1872; said pleas set out in full all the proceedings for the organization of the defendant company, including the original statement filed with the Secretary of State, the license to the commissioners to open books for subscriptions to the capital stock, the report of the commissioners, and the certificate of organization issued by the Secretary of State, etc.

The statement so filed with the Secretary of State shows the name of the corporation to be the "Chicago Gas Trust Company," that its capital stock is $25,000,000,00 divided into 250,000 shares of $100.00 each, that the location of its principal office is in Chicago, and that its duration is to be ninety .

nine years.    The statement also sets forth the object of the corporation in the following words :

"The object for which it is formed is to build, erect, purchase, lease, establish, maintain, enlarge, extend and operate or demise works in the city of Chicago, in the county of Cook and State of Illinois, and in such other place or places in said State of Illinois as said corporation may, by the vote of the majority of its stockholders, elect, for the manufacture, supply, sale and distribution of gas and electricity, or either, for the furnishing of light, heat, fuel and power, for any and all purposes for which gas or electricity may now or hereafter be used ; and to purchase and hold or sell the capital stock, or purchase or lease or operate the property, plant, good will, rights and franchises, of any gas works, or gas company or companies, or any electric company or electric companies, in said city of Chicago, Cook county, Illinois, or elsewhere in said State of Illinois, as said corporation may, by vote of the majority of the stockholders, elect ; and to purchase, hold, sell, operate or anywise become interested in coal or other properties productive of material necessary or useful in the supply or manufacture of gas, or other agency or medium of light, heat, power or fuel, and to sell, improve, enlarge, extend, maintain, operate or demise any and all property so purchased or leased."

The first, third and seventh pleas aver that the defendant has used and exercised and still does use and exercise "the said power, liberty, privilege and franchise of purchasing and holding *the* capital stock of gas companies in the State of Illinois," and "has purchased and still holds *capital stock* of the four gas companies mentioned in said information," etc.    The 2d, 4th, 5th, 6th, 9th, 10th and 11th pleas aver that the Chicago Gas Trust Company "has purchased and now holds a majority of the shares of the capital stock of the said" four companies, and "that it might lawfully purchase the said shares of stock because among the powers conferred upon it by its charter

from the State of Illinois was the power to purchase capital stock of any gas company or companies in the city of Chicago, county of Cook or elsewhere in the State of Illinois." In the 5th, 6th, 9th and 11th pleas the power is described as the "power to purchase *the* capital stock," and not as the "power to purchase capital stock." The 2d, 4th and 10th pleas describe the power as the "power to purchase capital stock." The 4th, 10th and 11th pleas use the words, "articles of association," in the place of the word, "charter." The 8th plea avers that the defendant "has purchased and now holds a majority of the shares of the capital stock of the said" four companies, "as well it might do, being lawfully authorized so to do by the provisions of its articles of incorporation."

Several of the pleas deny that the defendant has interfered with the control or operation of the four companies, and aver that said companies have been operated independently of each other and of the defendant. Several deny that defendant has destroyed the diversity of interest or motive for competition between the four companies. One or more of the pleas deny that defendant has usurped or that it holds the power, liberty and franchise of maintaining through said gas companies a virtual monopoly in the business of furnishing gas, etc.

The Attorney General demurred to the eleven pleas. The court below overruled the demurrer. The Attorney General stood by the demurrer, and final judgment of *nil capiat* was rendered on June 24, 1889. From that judgment an appeal is taken to this Court. The errors assigned are the overruling of the demurrer to each of the pleas, and rendering final judgment for the defendant below on the demurrer.

Mr. GEORGE HUNT, Attorney General, and Mr. JAMES K. EDSALL, for the appellants:

The power to purchase the capital stock of a corporation does not include power to purchase shares of such stock. Cook on Stock and Stockholders, sec. 3, note 2; *Porter* v. *Railroad Co.*

76 Ill. 566; *Hotel Co.* v. *Lieb,* 83 id. 610; *Starch Factory* v. *Dolloway,* 21 N. Y. 449; *Williams* v. *Telegraph Co.* 93 id. 162; *Delaware Railroad Tax Case,* 18 Wall. 206; *Burrill* v. *Railroad Co.* 75 N. Y. 211; *Van Allen* v. *Assessors,* 3 Wall. 583.

The general rule that special acts of incorporation, or grants of corporate power, shall be most strongly and strictly construed against the corporation, will be rigidly applied to these *ex parte* statements, prepared and signed by the promoters of a corporation formed under a general law like that of Illinois. *Railway Co.* v. *Railway Co.* 130 U. S. 26; *Fertilizing Co.* v. *Hyde Park,* 97 id. 659; *Turnpike Co.* v. *People,* 82 Ill. 174.

It is an established rule of law in the United States, that one corporation can not become a stockholder in another unless that power has been specially granted by statute. Boone's Law of Corporations, sec. 107; Field's Ultra Vires, p. 80; Green's Brice's Ultra Vires, (2d ed.) p. 91, note b; *Franklin Co.* v. *Lewiston Bank,* 68 Me. 43; *Mutual Savings Bank* v. *Meriden Co.* 24 Conn. 159; *Milbank* v. *Railroad Co.* 64 How. 20; *Railroad Co.* v. *Railroad Co.* 31 N. J. Eq. 475; *Berry* v. *Gates,* 24 Barb. 199; *Sumner* v. *Marcy,* 3 W. & M. 105; *Railroad Co.* v. *Collins,* 40 Ga. 582; *Hazelhurst* v. *Railroad Co.* 43 id. 13; *Franklin Bank* v. *Commercial Bank,* 36 Ohio St. 350; *Woods* v. *Railroad Co.* 5 Railway Corp. Law Jour. 372; 1 Morawetz on Corp. secs. 431, 433, 434.

A corporation, under the general law, can not acquire corporate powers not granted by statute, by the insertion of such powers in its statement filed with the Secretary of State. Rev. Stat. chap. 32, secs. 1, 2; *Railway Co.* v. *Railway Co.* 130 U. S. 1.

The power to purchase and hold a majority and controlling interest in the shares of stock of four competing corporations engaged in a public employment, is not for a "lawful purpose" for which a corporation may be organized, under the laws of this State.

What constitutes a "lawful purpose" for which to form a corporation, within the meaning of that term, as used in the statute, is a judicial question, to be determined by the courts in each case as it shall arise. Rev. Stat. chap. 32, secs. 1, 2; *Railway Co.* v. *Railway Co.* 130 U. S. 1.

To permit a trust company to be formed for the purpose of concentrating in its hands a controlling interest in the shares of stock of other competing corporations exercising a public employment, would necessarily so combine and blend their interest as to prevent competition between them, and thus injuriously affect the public interest. *Gas Light and Coke Co.* v. *Gas Light and Coke Co.* 121 Ill. 530; *Craft* v. *McConoughy*, 79 id. 346; *Weidenger* v. *Spruance*, 101 id. 278; *Milbank* v. *Railroad Co.* 64 How. 20; *Gibbs* v. *Gas Co.* 130 U. S. 396.

Whatever tends to prevent competition and create a monopoly in the hands of those who sustain such a relation to the public, is against public policy, and therefore unlawful. *Gas Light and Coke Co.* v. *Gas Light and Coke Co.* 121 Ill. 530; *Gibbs* v. *Gas Co.* 130 U. S. 396.

"Trusts" of this character, to hold a controlling interest in the shares of stock in other competing corporations, constitute one of the most insidious and dangerous schemes to secure and perpetuate monopolies ever invented. Cook on Trusts, pp. 28-31.

It is a familiar maxim, that competition is the life of trade. It follows, that whatever destroys or even relaxes competition in trade is injurious to it, and is therefore deemed unlawful, on grounds of public policy. Greenhood on Public Policy, 655, 656; *Hooker* v. *Vanderwater*, 4 Denio, 349.

If the tendency of the act complained of is to prevent competition and create a monopoly, it will be deemed against public policy, and therefore unlawful, without proof of evil intention or actual injury to the public. Ibid; Cook on Trusts, 21; *Salt Co.* v. *Guthrie*, 35 Ohio St. 666; *Gibbs* v. *Smith*, 115 Mass. 592; *Swan* v. *Chorpenning*, 20 Cal. 182.

This combination of the four competing gas companies of Chicago, through the intervention of this gas trust company, is against the policy of the consolidation laws of this State. *Gas Co.* v. *Light Co.* 115 U. S. 650.

Messrs. GOUDY, GREEN & GOUDY, for the appellee:

The Chicago Gas Trust Company, by the terms of its articles of incorporation, has the power to purchase stock in any other gas companies.

Nor is it in control of the four other gas companies mentioned in the information.

The charter of the Chicago Gas Trust Company is a complete warrant for the purchase of the stock mentioned in the pleas. Morawetz on Corp. sec. 318; *Railway Co.* v. *Riche,* 7 H. L. 653.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

The Chicago Gas Trust Company, appellee herein, was organized under the General Incorporation law of this State. The Statement filed by the original incorporators with the Secretary of State sets forth that the Trust Company was formed for two objects, or for one object of a two-fold character. The object, named in the first clause of the second specification of the "Statement," is, in brief, the erection and operation of works in Chicago, and other places in Illinois, for the manufacture, sale and distribution of gas and electricity. The object named in the second clause of the second specification of the "Statement," is, in brief, "to purchase and hold or sell the capital stock" of any gas or electric company or companies in Chicago or elsewhere in Illinois.

In this proceeding no attack is made upon the validity of the organization of the Gas Trust Company as a corporation. That it was formed in strict conformity with the requirements of the general Incorporation law is not denied by the People.

Nor does the State here question the right of the appellee company to acquire and operate works for the manufacture and sale of gas and electricity in pursuance of the object designated in the first clause above mentioned. Hence, the controversy arising upon the demurrer to the pleas in this case is not as to the right of appellee to exist as a corporation, nor as to its right to exercise the first one of the powers sought to be conferred upon it by its charter.

The controversy presented by the record relates solely to the authority of the appellee to carry out the object designated in the second clause above mentioned. It is claimed on the part of the People, that the charter or articles of association of the Gas Trust Company did not and could not confer upon it the power "to purchase and hold * * * the capital stock" of other gas companies. It is averred in the information, and admitted in eight of the eleven pleas, that appellee has purchased and now holds a *majority* of the shares of the capital stock of four gas companies, towit: The Chicago Gas Light and Coke Company, The People's Gas Light and Coke Company, The Equitable Gas Light and Fuel Company, and The Consumers' Gas Company; and it is admitted in three of the pleas, that the appellee has purchased and now holds *some portion* of the capital stock of said four companies.

The information charges that, by so purchasing and holding a majority of the shares of the capital stock of each of the four companies, the appellee usurps and exercises "powers, liberties, privileges and franchises not conferred by law." The appellee pleads in justification, that the power so to purchase and hold the stock is granted by the terms of its charter.

Can the Chicago Gas Trust Company lawfully purchase and hold the stock of other gas companies?

A distinction is sought to be drawn between "capital stock" and "shares of stock." It is said that capital stock means the entire property owned by the corporation, while a share in the stock is the right to partake, according to the amount put into

the fund, of the surplus profit obtained from the use and disposal of the capital stock of the company to those purposes for which the company is constituted. It is, therefore, insisted by the appellant, that even if the charter of the appellee can be held to confer the power to purchase and hold the general property or funds of other gas companies, it does not for that reason confer the power to purchase and hold shares of stock in such other companies.

The distinction contended for undoubtedly exists under certain circumstances and for certain purposes, but we think that, in the present case, the words—"the capital stock of any gas company or companies"—are broad enough to include shares of stock. In the general Incorporation Act, under which the appellee and the Consumers' Gas Company, and the Equitable Gas Light and Fuel Company, are all organized, the "Statement" is required to set forth "the name of the proposed corporation, the object for which it is to be formed, *its capital stock*, the *number of shares of which such stock shall consist*," etc. The original charter of the Chicago Gas Light and Coke Company provides, that "the capital stock of said company shall not exceed $300,000.00 *to be divided into shares of $25.00*," etc. The charter of the People's Gas Light and Coke Company as amended in 1865 also provides that its capital stock may be divided into shares. The terms thus used designate the capital stock of a corporation as that which consists of, or may be divided into, shares. Hence, for the purposes of the present discussion, "the capital stock of any gas company" may be regarded as the aggregate of all the shares of such stock.

The first, third and seventh pleas aver that the defendant uses and exercises "the power, liberty, privilege and *franchise* of purchasing and holding the capital stock of gas companies in the State of Illinois," and that, in such use and exercise thereof, "it has purchased and still holds *capital stock* of the four gas companies," etc., without stating how much capital stock it holds. The demurrer to these pleas might well have

been sustained on the ground that they do not answer the information. The information charges that the defendant has purchased and holds a majority of the shares of stock in each of the four companies, while the pleas answer by saying that defendant holds "capital stock," and do not set forth whether the stock so held is a majority or less than a majority of the shares. If it be conceded, however, that the three pleas are not defective for the reason thus specified, they present the question whether appellee can lawfully purchase and hold shares of stock in other gas companies, the number of such shares being less than a majority, and, therefore, too small to give a controlling interest in such other companies.

There are two views, which may be taken of the power to purchase and hold the capital stock of other gas companies as designated in said second clause. Must it be regarded as an original, independent power intended to exist exclusively of and in addition to the power named in the first clause, or may it be considered as merely ancillary to the other power of maintaining and operating works for the manufacture and sale of gas? If the latter view be correct, the main object, for which the Gas Trust Co. was formed, would be that it might itself maintain and operate works for the manufacture and sale of gas, while the purchase of shares of stock in other companies would be merely a subordinate object, incidental only to the main purpose of the corporate formation. An illustration of this idea may be found in the general Law of this State in regard to Life Insurance Companies, which makes it lawful for a Life Insurance Company organized in the State to "invest its funds or accumulations in the stocks of the United States * * * or in such other stocks and securities as may be approved by the Auditor." The main object of forming such a company is to engage in the business of Life Insurance, but the power to invest surplus funds in certain stocks is given as an incident to such business.

Can the power to purchase and hold the stock of other gas companies be lawfully exercised by the appellee as incidental to the main purpose of maintaining and operating works for the manufacture and sale of gas?

Corporations can only exercise such powers as may be conferred by the legislative body creating them, either in express terms, or by necessary implication; and the implied powers are presumed to exist to enable such bodies to carry out the express powers granted, and to accomplish the purposes of their creation. (*C. P. & S. W. R. R. Co.* v. *Marseilles,* 84 Ill. 643; *Chicago Gas Light Co.* v. *People's Gas Light Co.* 121 id. 530.) An incidental power is one that is directly and immediately appropriate to the execution of the specific power granted, and not one that has a slight or remote relation to it. (*Hood* v. *N. Y. & N. H. R. R.* 22 Conn. 1; *Franklin Co.* v. *Lewiston Savings Institution,* 68 Maine, 43).

Where a charter in express terms confers upon a corporation the power to maintain and operate works for the manufacture and sale of gas, it is not a necessary implication therefrom that the power to purchase stock in other gas companies should also exist. There is no necessary connection between manufacturing gas and buying stocks. If the purpose for which a gas company has been created is to make and sell gas and operate gas works, the purchase of stock in other gas companies is not necessary to accomplish such purpose. "The right of a corporation to invest in shares of another company cannot be implied because both companies are engaged in a similar kind of business." (1 Morawetz on Priv. Corp. sec. 431).

It is true that a gas company might take the stock of another corporation in payment of a debt, or perhaps as security for a debt, but the actual purchase of such stock is not directly and immediately appropriate to the execution of a specifically granted power to operate gas works and manufacture gas. Some corporations, like insurance companies, may find it necessary to keep funds on hand for the payment of losses by

death or fire, or to meet other necessary demands, but it is questionable whether even these can invest their surplus funds in the stocks of other corporations without special legislative authority.    But there is nothing in the nature of a gas company, which renders it proper for such a company to accumulate funds for outside investment; its surplus profits belong to the stockholders, and, when distributed among them, can be used by them as they see fit.

If, then, the power to purchase outside stocks cannot be implied from the power to operate gas works and make and sell gas, a company, to whom the latter power has been expressly granted, cannot exercise the former without legislative authority to do so.    This is the law as settled by the great weight of authority.

Boone on the Law of Corporations says: "Without a power specifically granted, or necessarily implied, a corporation cannot become a stockholder in another corporation, and especially where the object is to obtain the control or affect the management of the latter."    In Green's Brice's Ultra Vires (page 91, note b) it is said: "In the United States a corporation cannot become a stockholder in another corporation unless by power specifically granted by its charter, or necessarily implied in it."    So also Morawetz on Private Corporations (secs. 431, 433) says: "A corporation has no implied right to purchase shares in another company for the purpose of controlling its management.    *    *    *    A corporation cannot, in the absence of express statutory authority, become an incorporator by subscribing for shares in a new corporation, nor can it do this indirectly through persons acting as its agents or tools."    The authorities referred to by these text writers sustain the conclusions announced by them.    It has been held in many cases, that, "in the United States, corporations cannot purchase, or hold, or deal in the stocks of other corporations, unless expressly authorized to do so by law," and that "one corporation cannot become the owner of any

portion of the capital stock of another corporation, unless authority to become such is clearly conferred by statute." (*Franklin Co.* v. *Lewiston Sav. Ins. supra; Franklin Bank* v. *Commercial Bank,* 36 Ohio St. 350 ; *Milbank* v. *N. Y., L. E. & W. R. R. Co.* 64 How. (N. Y.) 20 ; *Sumner* v. *Marcy,* 3 W. & M. 105 ; *Mut. Savings Bank* v. *Meriden Agency,* 24 Conn. 159 ; *Central R. R. Co.* v. *Collins,* 40 Ga. 582 ; *Hazelhurst* v. *Savannah R. R. Co.* 43 id. 13 ; *Berry* v. *Gates,* 24 Barb. 199).

The special charters of the Chicago Gas Light and Coke Co. and of the People's Gas Light and Coke Co., which are set out in full in the information and not called in question in any of the pleas, confer, by express grant, the power to erect gas works and manufacture and sell gas, etc., but do not confer the power to buy shares of stock in other companies; upon the latter subject they are silent. It will not be denied, that, under the authorities already cited, these two companies cannot buy and hold stock in other gas companies. The same would undoubtedly be admitted to be true of the Chicago Gas Trust Company, if it held under a special charter of like tenor and effect granted before the adoption of the constitution of 1870. Does it make any difference that the appellee was organized under the general incorporation Act?

The general incorporation Act of this State does not, in express terms, confer upon the corporations organized under it the power to purchase and hold shares of stock in other corporations. It is silent upon that subject. The only powers granted by it are the ordinary corporate powers, such as the rights to be bodies corporate and politic, to sue and be sued, to have a common seal, etc. The charter of a corporation formed under such a general law does not consist of the articles of association alone, but of such articles taken in connection with the law under which the organization takes place. (1 Morawetz on Priv. Corp. sec. 318). The provisions of the law enter into and form a part of the charter. It certainly cannot be true, that a corporation, formed under the general

incorporation Act for a purpose other than that of dealing in stocks, can exercise the power of purchasing and holding stock in other corporations, where such power cannot be necessarily implied from the nature of the power specifically granted, and is not necessary to carry the latter into effect.

The power to purchase and hold stock in other companies must be the subject of legislative grant, if not in all cases, at least in cases where it cannot be implied from the powers expressly granted. The general incorporation law contains no grant of such power by the legislature. Can a corporation organized under that law be clothed with such a power by merely naming it in the Statement filed with the Secretary of State? We think not. The action of the Secretary of State in issuing the license and the certificate of organization is, necessarily, to a large extent, merely ministerial. *(Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1; 4 Am. & Eng. Ency. of Law, Tit. Corporations; page 192, note 1). Whether the articles of association, consisting of the Statement, the License, the Report of the Commissioners, the Certificate of Organization, etc., do or do not confer such rights and powers as are authorized by the law, is a matter for judicial determination. Counsel for appellee say: "We do not claim, of course, that the action of the Secretary of State is conclusive and not subject to review by this court," etc.

The question whether or not the power to purchase stock is a lawful purpose under section one of the Incorporation Act, which provides that "corporations may be formed in the manner provided by this act *for any lawful purpose,*" does not arise under this branch of the discussion. It will be pertinent when we come to consider the right to buy and hold stock, as an original and independent power, or object of formation. It is not denied by the appellant, that the organization of appellee for the purpose of erecting gas works and making and selling gas, is an organization for a lawful purpose. Viewing that as the main purpose for which appellee was formed, the in-

corporators could not tack on and connect with such main purpose the power to buy and hold stock in other gas companies by merely describing such power in the Statement.    To hold, that they could confer such power by writing it down in the Statement, would be to hold that the General Assembly could clothe them with a part of its legislative functions.

When a corporation is formed under the general incorporation act for the purpose of carrying on a lawful business, the law, and not the Statement, or the License, or the Certificate, must determine what powers can be exercised as incidents to such business.    Even if shares of stock be regarded as personal property, as claimed by counsel for appellee, section five (5) of the general law provides, that corporations formed under it "may own    *    *    *    so much    *    *    *    personal estate as shall be necessary for the transaction of their business, and may sell and dispose of the same when not required for the uses of the corporation,    *    *    *    and may have and exercise all the powers necessary and requisite to carry into effect the objects for which they may be formed."    This language negatives the idea that a corporation formed under the general law can exercise the power of buying and holding the stock of other companies.    A company engaged on its own account in manufacturing and selling gas does not need the stock of other gas companies in order to transact its business.    Hence, it is forbidden to own such stock, the same being "personal estate."

The language of the Act, as thus quoted, expressly restricts the powers of a corporation organized under it to such powers as are necessary and requisite to carry into effect the object for which it was formed.    We have already seen, that, where the object of forming a gas company is to engage in the business of making and selling gas, the purchase of stock in other companies is not necessary to carry such object into effect. Therefore, the general incorporation Act not only does not expressly authorize the purchase of such stock, but impliedly

forbids it in cases where the main purpose of the corporate creation is other than the purchase and sale of stocks.

It has been held, that the powers obtained by corporations organized under general laws are necessarily restricted to those mentioned in the act (*Medical Coll. Case,* 3 Whart. (Pa.) 445;) that, in such cases, the charter is void as to all powers and privileges granted beyond the provisions of the statute (*Heck* v. *McEven,* 12 Lea, (Tenn.) 97); that, if unauthorized provisions are added to the articles of incorporation, all acts done pursuant to such provisions will be void (*Eastern Plank R. Co.* v. *Vaughan,* 14 N. Y. 546); that anything in such articles not warranted by the statutes, authorizing the formation of corporate bodies, is void for want of authority (*Oregon Ry. Co.* v. *Oregonian Ry. Co.* 130 U. S. 1); and that such articles must be construed strictly, and against the grantee and in favor of the government or the general public. (idem.)

Our conclusion upon this branch of the case is, that, if the Chicago Gas Trust Company be regarded as a corporation formed for the purpose of erecting or operating gas works and manufacturing and selling gas, it has no power to purchase and hold or sell shares of stock in other gas companies, as an incident to such purpose of its formation, even though such power is specified in its articles of incorporation.

We come now to the second view of the right to purchase and hold the stock of other companies, which is involved in the issue presented by the demurrers to all of the eleven pleas including the first, third and seventh.

The eight pleas other than the three last named are bad on demurrer, because they do not set out the defendant's title specially. It is not enough to allege generally that the power or franchise in question was among the powers conferred by the charter; the pleas should set forth particularly and in detail the facts, which show how the corporate power or franchise was conferred upon or acquired by the defendant. (*Clark* v. *The People ex rel.* 15 Ill. 213; *Carrico* v. *The People,* 123 id. 198).

But if this technical objection be waived, the eight pleas are demurrable for reasons which go to the merits. Some of them aver that the charter confers the power to purchase "*the* capital stock" of other gas companies, which, as hereafter stated, means *all* the capital stock of such companies. Others of them are less explicit. But all of them aver that the charter granted a power broad enough to authorize the purchase of a majority of the shares of the capital stock of other gas companies, and that, under it, such majority of shares has been purchased. All of them plead the right to so purchase a majority of said shares as an original and independent power or franchise without reference to the other power of making and selling gas. Hence they fall within the objections hereinafter stated.

The language of the Statement as set out in the first, third and fourth pleas imports an intention to create the Chicago Gas Trust Company for two independent objects. The clauses describing these objects are connected by the conjunction, "and." Both were designed to be of equal importance, and to be carried out independently of each other. According to the plain meaning of the terms, in which they are set forth, neither was to be regarded as secondary or incidental. The first of these objects is stated as follows: "to build, erect, purchase, lease, establish, maintain, enlarge, extend and operate or demise works in   *   *   *   Chicago   *   *   *   and in such other place or places in   *   *   *   Illinois as said corporation may, by the vote of the majority of its stockholders, elect, for the manufacture, supply, sale and distribution of gas and electricity or either, for the furnishing of light, heat, fuel and power," etc. There is nothing in this record to show, that appellee has ever done anything towards the accomplishment of this first object.

The second of the two objects is stated as follows: "*And* to purchase and hold or sell the capital stock, or purchase, or lease, or operate the property, plant, good will, rights and

19—130 ILL.

franchises of any gas works, or gas company or companies, or any electric company or electric companies in  *  *  *  Chicago  *  *  *  or elsewhere in  *  *  *  Illinois, as said corporation may, by vote of the majority of the stockholders, elect," etc.

Manufacturing and selling gas is one kind of business; dealing in stocks is another and different kind of business. If it appeared that the appellee was engaged in both under its present charter, a serious question might arise as to the power to organize one corporation for two distinct purposes under the general incorporation act of this State. This record, however, only shows that the appellee is exercising the power designated by the declaration of the second object of its formation. What is the power which it is so exercising?

If appellee can "purchase and hold *the* capital stock" of other gas companies, it can hold *all* the capital stock of such companies. "*The* capital stock" does not mean a *part*, but the *whole*. We have already seen that "the capital stock," as those words are here used, includes all the *shares* of stock. This view is strengthened by the use of the words, "or purchase, or lease, or operate *the property*, plant, good-will, rights and franchises" of any gas company. If capital stock meant nothing but property, the right to purchase property would not be mentioned in separate words. Counsel for appellee say in their brief: "it is a pretty nice distinction to say that the power to buy *capital stock* of a corporation does not include the power to purchase certain of the shares of that stock." If power to purchase "*capital stock*" includes the power to purchase "*certain of the shares of that stock*," then power to purchase "*the* capital stock" includes the power to purchase *all* the shares of such stock.

The power sought to be conferred by these articles of association is something more than the mere right of purchasing certain shares of the stock of other gas companies as an investment; an attempt has here been made to vest the Chicago

Gas Trust Company with the tremendous power of purchasing and holding all the shares of stock, and purchasing and operating all the property, rights and franchises of every gas company not only in Chicago, but in the State of Illinois. What has been done under the power thus claimed to have been lawfully granted?

There were four gas companies in the City of Chicago, whose names have already been mentioned. One of them, under an old charter of 1849, had the right to lay its mains and pipes in the streets without permission of the city. The other three had permission to do so under ordinances passed by the city council. All of them laid their pipes and mains and were engaged in making gas and furnishing it to the inhabitants. They were the only gas companies, who were so engaged, and who had undertaken to make such use of the public streets. The Chicago Gas Trust Company has purchased and now holds a majority of all the shares of stock of these four companies. It was itself organized with a capital stock of $25,000,000.00; the capital stock of the four companies was $16,984,200.00. How great a majority of such stock is held by the appellee does not appear from the record. What results must necessarily follow from such ownership of a majority of the shares of stock of these four companies?

One result is that the Chicago Gas Trust Company can control the four other companies. The question is not whether it has attempted to exercise such control; the law looks to the general tendency of the power conferred. (Greenhood on Public Policy, page 5; *Richardson* v. *Crandall*, 48 N. Y. 343; *Salt Co.* v. *Guthrie*, 35 Ohio St. 666.) The sixth section of the general incorporation Act provides that the corporate powers shall be exercised by a board of directors or managers, and that the number of such directors or managers, and their terms of office, shall depend upon "the consent of the owners of a majority of the shares of stock." It cannot be denied that the appellee, as owner of the majority of the shares of stock of

these four companies, can control them, in the exercise of all
their corporate powers, through a board of managers of its
own selection. In *Weidenger* v. *Spruance*, 101 Ill. 278, this
Court, speaking through Mr. Justice Scholfield, said: "The
stockholders elect the directors, and, through them carry into
effect the corporate functions. Presumably, the directors act
in obedience to the aggregate wishes of the stockholders," etc.
(*Milbank* v. *N. Y. L. E. & W. R. R. Co.* 64 How. N. Y. Rep. 29.)

The control of the four companies by the appellee — an
outside and independent corporation—suppresses competition
between them, and destroys their diversity of interest and all
motive for competition. There is thus built up a virtual mo-
nopoly in the manufacture and sale of gas.

The fact, that the appellee almost immediately after its or-
ganization bought up a majority of the shares of stock of each
of these companies, shows that it was not making a mere in-
vestment of surplus funds, but that it designed and intended
to bring the four companies under its control, and, by crushing
out competition, to monopolize the gas business in Chicago.

The general incorporation act provides, "that corporations
may be formed in the manner provided by this act *for any
lawful purpose* except banking, insurance, real estate broker-
age, the operation of railroads and the business of loaning
money." The purpose, for which a corporation is formed un-
der the act, must be a *lawful* purpose. So far as appellee
was organized with the object of purchasing and holding all
the shares of the capital stock of any gas company in Chicago,
or Illinois, it was not organized for a lawful purpose, and all
acts done by it towards the accomplishment of such object are
illegal and void.

The word "unlawful" as applied to corporations is not used
exclusively in the sense of *malum in se*, or *malum prohibitum*.
It is also used to designate powers which corporations are
not authorized to exercise, or contracts which they are not
authorized to make, or acts which they are not authorized to

do; or, in other words, such acts, powers and contracts as are *ultra vires*. (*Franklin Co.* v. *Lewiston Sav. Ins. supra; Oregon Ry. Co.* v. *Oregonian Ry. Co. supra*).

The business of manufacturing and distributing illuminating gas by means of pipes laid in the streets of a city is a business of a public character; it is the exercise of a franchise belonging to the State; the services rendered and to be rendered for such a grant, are of a public nature; companies engaged in such business owe a duty to the public; any unreasonable restraint upon the performance of such duty is prejudicial to the public interest and in contravention of public policy. (*Chicago Gas Light Co.* v. *People's Gas Light Co.* 121 Ill. 530; *Gibbs* v. *Baltimore Gas Co.* 130 U. S. 396).

Whatever tends to prevent competition between those engaged in a public employment, or business impressed with a public character, is opposed to public policy and, therefore, unlawful. Whatever tends to create a monopoly is unlawful as being contrary to public policy. (2 Addison on Cont. 743; Greenhood on Public Policy, pages 180, 643, 654, 655, 670; *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Pa. St. 173; *Craft* v. *McConoughy*, 79 Ill. 346; *Central R. R. Co.* v. *Collins*, 40 Ga. 582; *Hazelhurst* v. *Savannah R. R. Co.* 43 id. 13; *Trans. Co.* v. *Pipe Line Co.* 22 W. Va. 600).

In *Craft* v. *McConoughy, supra*, where the opinion was delivered by Mr. Justice Craig, we said: "We understand it to be a well settled rule of law, that an agreement in general restraint of trade is contrary to public policy, illegal and void, etc. * * * Whatever is injurious to the interest of the public is void on the ground of public policy." In *Salt Co.* v. *Guthrie, supra*, the Supreme Court of Ohio said: "Public policy unquestionably favors competition in trade to the end that its commodities may be afforded to the consumer as cheaply as possible, and is opposed to monopolies, which tend to advance market prices to the injury of the general public."

We are reminded by counsel that the application by the courts of public policy to the law is a usurpation of legislative functions. And undoubtedly some courts have gone so far as to deserve the charge of such usurpation. But it is the duty of the judiciary to refuse to sustain that which is against the public policy of the State, when such public policy is manifested by the legislation, or fundamental law of the State. (*Female Academy* v. *Sullivan*, 116 Ill. 375). By chapter 28 of our Revised Statutes it is provided, that "the common law of England so far as the same is applicable and of a general nature * * * shall be the rule of decision and shall be considered of full force until repealed by legislative authority." Public policy is that principle of the law which holds, that no subject or citizen can lawfully do that which has a tendency to be injurious to the public, or against the public good. This principle owes its existence to the very sources from which the common law is supplied. (Greenhood on Public Policy, pages 2 and 3).

The common law will not permit individuals to oblige themselves by a contract either to do or not to do anything when the thing to be done or omitted is in any degree clearly injurious to the public. (*Chappel* v. *Brockway*, 21 Wend. 159; *Transportation Co.* v. *Pipe Line Co.* 22 W. Va. 600). In *Stanton* v. *Allen*, 5 Denio, 434, an agreement, whose tendency was to prevent competition, was held to be void by the principles of the common law, because it was against public policy and injurious to the interests of the State.

"Contracts creating monopolies are null and void as being contrary to public policy." (2 Addison on Cont. 743). All grants creating monopolies are made void by the common law. (7 Bacon's Abridgment, page 22). In *The case of the Monopolies*, (Coke's Reports, Vol. 6, part XI, page 84,) it was decided as long ago as the forty fourth year of the reign of Queen Elizabeth, that a "grant to the plaintiff of the sole making of cards within the realm was utterly void, and that for two rea-

sons: 1. That it is a monopoly and against the common law, 2. That it is against divers acts of parliament," etc.  (*Bell* v. *Leggett*, 7 N. Y. 176; *Trist* v. *Child*, 21 Wall. 441).

If contracts and grants, whose tendency is to create monopolies are void at common law, then where a corporation is organized under a general statute, a provision in the declaration of its corporate purposes, the necessary effect of which is the creation of a monopoly, will also be void.

Speaking of the articles of association of corporations formed under general laws, the Supreme Court of the United States says: "We have to consider, when such articles become the subject of construction, that they are in a sense *ex parte*; their formation and execution—what shall be put into them as well as what shall be left out—do not take place under the supervision of any official authority whatever.  They are the production of private citizens, gotten up in the interest of parties who propose to become corporators, and stimulated by their zeal for the personal advantage of the parties concerned rather than the general good.  *  *  *  These articles, which necessarily assume by the sole action of the corporators enormous powers, many of which have been heretofore considered of a public character, sometimes affecting the interests of the public very largely and very seriously, do not commend themselves to the judicial mind as a class of instruments requiring or justifying any very liberal construction.  Where the question is whether they conform to the authority given by statute in regard to corporate organization, it is always to be determined upon just construction of the powers granted therein with a due regard for all the other laws of the State upon that subject.  *  *  *  The manner in which these powers shall be exercised, and their subjection to the restraint of the general laws of the State and its general principles of public policy, are not in any sense enlarged by inserting in the articles of association the authority to depart therefrom."  (*Oregon Ry. Co.* v. *Oregonian Ry. Co. supra*).

In the *Oregon Railway case, supra,* a railroad corporation had been organized under a general law of the State of Oregon, which contained the following provision: "Whenever three or more persons shall desire to incorporate themselves for *the purpose of engaging in any lawful enterprise,* business, pursuit or occupation, they may do so in the manner provided in this act," and it was declared in the articles of association that the company might exercise the power to lease the railroad. The Court there held, that the power to' lease its road and turn over the use of its franchises to another company was not authorized by the general incorporation act of the State, nor by the course of legislation therein, and that, therefore, such power could not be conferred by the declaration contained in the articles of association. The leasing of the road, in the absence of statutory authority therefor, was not sanctioned as being a "*lawful* enterprise" within the meaning of the language above quoted.

The public policy of a State may be indicated by the provisions of its constitution as related to past and present legislation. In *N. O. Gas Co.* v. *Louisiana Gas Co.* 115 U. S. 650, a gas company had been given in 1835 the exclusive privilege of making and selling gas in New Orleans for some fifty years, and the question was whether such exclusive privilege was abrogated by the new constitution of 1879, which contained a provision abolishing the monopoly features in all existing charters. The United States Supreme Court said in that case: "The monopoly clause only evinces a purpose to reverse the policy, previously pursued, of granting to private corporations franchises accompanied by exclusive privileges as a means of accomplishing public objects."

We have been referred to more than fifty special charters granted by the legislature of this State, in the years 1853, 1854, 1855, 1857, 1859, 1861, 1865, 1867 and 1869, to gas companies in various cities and towns in the State, each one of which confers the exclusive privilege of laying gas pipes in

the streets for a number of years.   But when the constitution of 1870 was adopted, it provided, in section 22 of article 4, that the general assembly should pass no local or special law for "granting to any corporation, association or individual any special or exclusive privilege, immunity or franchise whatever," and, in section 1 of article XI, that "no corporation shall be created by special laws,  *  *  *  but the general assembly shall provide, by general laws, for the organization of all corporations hereafter to be created."

Manifestly the constitution of 1870 reversed the old policy of granting exclusive privileges to gas companies.   After 1870 the public policy of the State was against the granting of exclusive privileges to corporations of any kind.   The general incorporation act of 1872 was passed in pursuance of section 1 of article XI.   The prohibition of special charters granting exclusive privileges, and the authorization of incorporations under a general law, followed by the passage of such a law, put the people of this State on record as being opposed to the creation of monopolies of all kinds.

But of what avail is it that any number of gas companies may be formed under the general incorporation law, if a giant trust company can be clothed with the power of buying up and holding the stock and property of such companies, and, through the control thereby attained, can direct all their operations and weld them into one huge combination?   The several privileges or franchises intended to be exercised by a number of companies are thus vested exclusively in a single corporation.   To create one corporation for the express purpose of enabling it to control all the corporations engaged in a certain kind of business, and particularly a business of a public character, is not only opposed to the public policy of the State, but is in contravention of the spirit, if not the letter, of the constitution.

That the exercise of the power attempted to be conferred upon the appellee company must result in the creation of a

monopoly, results from the very nature of the power itself. If the privilege of purchasing and holding all the shares of stock in all the gas companies of Chicago can be lawfully con- ferred upon appellee under the general incorporation act, it can be lawfully conferred upon any other corporation formed for the purpose of buying and holding all the shares of stock of said gas companies. The design of that act was that any number of corporations might be organized to engage in the same business, if it should be deemed desirable. But the business now under consideration could hardly be exercised by two or three corporations. Suppose that after appellee had purchased and become the holder of the majority of shares of stock of the four companies in Chicago, another corpora- tion had been organized with the same object in view, that is to say, for the purpose of purchasing and holding a majority of the shares of stock of the gas companies in Chicago. There being only four of such companies, what would there be for the corporation last formed to do? It could not carry out the object of its creation, because the stock it was formed to buy was already owned by an existing corporation. Hence to grant to the appellee the privilege of purchasing and holding the capital stock of any gas company in Chicago is to grant to it a privilege which is exclusive in its character. It is making use of the general incorporation law to secure a special "privi- lege, immunity or franchise"; it is obtaining a special charter, under the cover and through the machinery of that law, for a purpose forbidden by the constitution. To create one corpo- ration that it may destroy the energies of all other corporations of a given kind, and suck their life blood out of them, is not a "lawful purpose."

It may be here stated, as showing the policy of the State to be against the purchase by one gas company of stock in other corporations, that the power to purchase such stock is not granted in any of the more than fifty special charters above named. On the contrary, in each of these charters, the power

of the gas company to acquire and hold personal property is limited to such personal estate, "as may be necessary and proper for the construction, extension and usefulness of the works of said company, and for the management and good government of the same."

The power of purchasing and holding the capital stock of the four gas companies in question tends to relieve appellee of a proper share of its legal obligations, and to enable it to carry on a gas business without subjecting itself to the restrictions imposed by the statute.    To this extent the exercise of such power is not lawful.

The successful operation of a gas company in any city requires the use of the public streets for the purpose of laying pipes and mains.    Section 1 of article 5 of the general Act for the incorporation of cities and villages confers upon the city council the power to regulate the use of the streets, to provide for the lighting of the same, and to regulate the openings therein for the laying of gas pipes and mains, and erecting gas lights; by the same section it is also provided, that any company "organized for the purpose of manufacturing illuminating gas to supply cities or villages or the inhabitants thereof, with the same, shall have the right, by consent of the common council (subject to existing rights) to erect gas factories, and lay down pipes in the streets or alleys of any city or village in this State, subject to such regulations as any such city or village may by ordinance impose."

The general Act for the formation of corporations, considered with reference to the powers conferred by it upon gas companies organized under it, must be construed in connection with the city incorporation Act.    The provisions of the latter act as above quoted are to be considered as a part of every charter granted to a gas company under the former act. The charter, or, speaking more accurately, the articles of association, of every such gas company can only be issued or accepted subject to the foregoing provisions.    Hence, the

appellee company could not exercise the power of operating works for the manufacture and sale of gas in Chicago without submitting to such regulations as the common council of the city might by ordinance impose, nor could it erect a gas factory and lay its pipes in the streets without the consent of the common council. It accepted its certificate of organization subject to the condition, that it would obtain such consent and submit to such regulations, if it engaged in the business of making and selling gas in that city. As between it and the State, it was bound to fulfill this condition in its capacity as a separate and independent organization, and not as the governing influence in the directories of other organizations.

But it either does, or may, engage in the business of making and selling gas in Chicago without obtaining the consent of the council and without submitting to the regulations of the city, by operating through the four companies, a majority of whose stock it owns, and whose business it can, therefore, control. It thus indirectly makes use of privileges granted to the four companies, but never granted directly to itself. The regulations, which the common council might have deemed it necessary to make with reference to the use of the streets by appellee, may not have been the same as those which the four companies were required to submit to.

But this is not all. By the terms of the provision above quoted, appellee could only obtain the consent of the council to erect gas factories and lay pipes in the streets of the city "subject to existing rights." What were "existing rights"? The rights already secured by the four companies to use the streets and alleys and make and sell gas. But the appellee, through the controlling interest which it owns in the stock of the four companies, can use the streets and make and sell gas, independently of the existing rights of the four companies, and not only so, but it either does, or may, absorb, combine and use the rights of said companies, and subordinate them to its own purposes.

In the mode thus indicated the appellee, in the exercise of the extraordinary power sought to be conferred upon it, may avoid the wholesome restrictions of the law applicable to the circumstances, under which gas companies are permitted to use the public streets. By the use of the words, "subject to existing rights," in the city incorporation act, the Legislature plainly indicated its intention that there should be no combination between gas companies, but that each should separately pursue its business of furnishing gas to the inhabitants. If every new company seeking the consent of the council to its use of the streets for laying gas pipes is required to accept such consent "subject to existing rights," the companies already existing, and already exercising the rights of using the streets and furnishing light, must be allowed to continue to do so, and to do so independently of the new company, and as separate organizations under their respective charters.

Gas companies being engaged in a business of a public character are charged with the performance of public duties. Their use of the streets, whose fee is held by the municipal corporation in trust for the benefit of the public, has been likened to the exercise of the power of eminent domain. (*Chicago Gas Light and Coke Co.* v. *People's Gas Light and Coke Co. supra.*) In *Gibbs* v. *Baltimore Gas Co. supra*, the Supreme Court of the United States, in an able opinion delivered by Mr. Chief Justice Fuller, uses these words: "These gas companies entered the streets of Baltimore, under their charters, in the exercise of the equivalent of the power of eminent domain, and are to be held as having assumed an obligation to fulfill the public purposes to subserve which they were incorporated."

The privileges awarded to the four gas companies under their respective charters were given them in return for, and in consideration of, services to be rendered by them to the public. When they entered the streets of Chicago, they assumed the performance of the public duty of furnishing light to the in-

habitants.    That they should be permitted, or required, or forced, to abandon the performance of such public duty is against the policy of the law.    The public duty is imposed upon each company separately, and not upon the four when combined together.    Each for itself, when it accepted its articles of association, assumed an obligation to perform the objects of its incorporation.    But the appellee, through the control which it does or may exercise over the four companies by reason of its ownership of a majority of their stock, renders it impossible for them to discharge their public duties except at the dictation of an outside force, and in the manner prescribed by a corporation operating independently of them. They are thus virtually forced to abandon the performance of their duty to the public.    The freedom and effectiveness of their action in carrying out the purposes of their creation are seriously interfered with, if not actually destroyed.    A power, whose exercise leads to such a result cannot be lawfully entrusted to any corporate body.

We held, in *Chicago Gas Light Co.* v. *People's Gas Light Co. supra*, that, for the reasons there stated, a contract between two of these four companies, the effect of which was to stifle competition between them and necessitate an abandonment of their public duties, was against public policy and could not be enforced.    The attempt to consolidate the two companies, by placing the majority of their stock in the hands of the appellee, would accomplish the same unlawful result, which was sought to be attained by the forbidden contract.

In ordinances passed by the common council of the city of Chicago, granting permission to the other two of the four companies, to wit: the Equitable Gas Light and Fuel Company, and the Consumers' Gas Company, (or its predecessor,) to lay pipes in the streets for the purpose of supplying gas to the inhabitants of the city, it was provided that such permission should not take effect, until the two last named companies had given bond not to "sell, lease or transfer their franchises and

privileges to any other gas company," and not to "enter into any combination with any other company concerning the rate (or price) to be charged for gas." But the Chicago Gas Trust Company, by reason of its ownership of the majority of the shares of stock of the Consumers' Company, and the Equitable Company, can effect a virtual transfer of their franchises and privileges to itself, in spite of the condition imposed by the ordinance, and in utter disregard of the public interests.

We concur in the following views expressed by the Supreme Court of Georgia in the case of *The Central R. R. Co.* v. *Collins, supra :* "All experience has shown that large accumulations of property in hands likely to keep it intact for a long period are dangerous to the public weal. Having perpetual succession, any kind of a corporation has peculiar facilities for such accumulation, and most governments have found it necessary to exercise great caution in their grants of corporate powers. Even religious corporations professing, and in the main, truly, nothing but the general good, have proven obnoxious to this objection, so that in England it was long ago found necessary to restrict them in their powers of acquiring real estate. Freed as such bodies are from the sure bound to the schemes of individuals—the grave—they are able to add field to field, and power to power, until they become entirely too strong for that society which is made up of those whose plans are limited by a single life."

We are of the opinion that the court below erred in overruling the demurrers to the pleas.

The judgment of the Circuit Court is reversed, and the cause is remanded to that court with directions to sustain the demurrers to the pleas, and for further proceedings in accordance with the views here expressed.

*Judgment reversed.*